**Slip Op. 10-20**

UNITED STATES COURT OF INTERNATIONAL TRADE

—————————————————————

BENQ AMERICA CORPORATION,            :

                   *Plaintiff*,            :

               v.            :            Court No. 05-00637

THE UNITED STATES,            :

                   *Defendant*.            :

—————————————————————

[Plaintiff's motion for summary judgment is denied; Defendant's cross-motion is granted.]

Dated:  March 1, 2010

Adduci, Mastriani & Schaumberg, L.L.P. (V. James Adduci II, Harvey B. Fox, Munford Page Hall, II, and Paul G. Hegland), for Plaintiff.

Tony West, Assistant Attorney General; Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Mikki Cottet); Beth C. Brotman, Office of the Assistant Chief Counsel, International Trade Litigation, Bureau of Customs and Border Protection, U.S. Department of Homeland Security, Of Counsel; for Defendant.

**OPINION**

RIDGWAY, Judge:

In this action, Plaintiff BenQ America Corporation challenges the decision of the Bureau of Customs and Border Protection denying BenQ's protest concerning the tariff classification of certain liquid crystal display ("LCD") monitors imported from the People's Republic of China in mid-May 2004.[1]

———————————————

[1]The Bureau of Customs and Border Protection – part of the U.S. Department of Homeland Security – is commonly known as U.S. Customs and Border Protection.  The agency is referred to as "Customs" herein.

The Government maintains that Customs properly classified the merchandise at issue –

Dell™ 2001FP Flat Panel Color Monitors – as "video monitors" under heading 8528 of the

Harmonized Tariff Schedule of the United States ("HTSUS"), assessing duties at the rate of five

percent *ad valorem*. *See generally* Defendant's Memorandum in Opposition to Plaintiff's Motion

for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment

("Def.'s Brief"); Reply to Plaintiff's Opposition to Defendant's Cross-Motion for Summary

Judgment ("Def.'s Reply Brief"); *see also* Heading 8528, HTSUS (2004).[2]

BenQ contends that the monitors instead should have been classified as display units for

automatic data processing ("ADP") machines under HTSUS heading 8471, duty-free. *See generally*

Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Pl.'s Brief");

Plaintiff's Memorandum of Law in Response to Defendant's Opposition to Plaintiff's Motion for

Summary Judgment and Cross-Motion for Summary Judgment ("Pl.'s Reply Brief"); *see also*

Heading 8471, HTSUS.

This action, which has been designated a test case pursuant to USCIT Rule 84, is before the

Court on cross-motions for summary judgment. Jurisdiction lies under 28 U.S.C. § 1581(a) (2000).[3]

As discussed below, Customs properly classified the imported merchandise as video monitors under

HTSUS heading 8528. Accordingly, BenQ's motion for summary judgment must be denied, and

the Government's cross-motion granted.

_____

[2]Except as otherwise indicated, all citations herein are to the 2004 edition of the HTSUS.

[3]All statutory citations herein (other than citations to the HTSUS) are to the 2000 edition of
the United States Code.

# I. **Background**

The imported merchandise – Dell™ 2001FP Flat Panel Color Monitors – are flat panel LCD (liquid crystal display) monitors, with screens measuring 20.1 inches on the diagonal, which were manufactured for Dell™ by BenQ Corporation (a Taiwanese company of which Plaintiff BenQ America was a part).  *See* Dell™ 2001FP Flat Panel Color Monitor User's Guide (Pl.'s Exh. 16) at 16-4, 16-50; Pl.'s Brief at 9, 23; *see also id*. at 1, 6; Def.'s Brief at 2-3.[4]

According to a study commissioned by BenQ, which surveyed purchasers of the monitor at issue (and a somewhat earlier model), "[a] very large majority (86.6 percent) of survey respondents . . . purchas[ed] the monitors . . . for use principally as a display unit for computer uses," and "[a]n overwhelming majority (more than 99 percent of survey respondents)" were using the monitors with a computer.  *See* Pl.'s Brief at 1-2, 18-19, 20, 24, 27, 29; Pl.'s Reply Brief at 3, 5, 6, 13-15, 24, 25-26; *but see* Def.'s Brief at 19-20, 23, 24-25; Def.'s Reply Brief at 4-14.[5]

---

[4]BenQ touts Dell™ as "the number one supplier of personal computer systems worldwide." *See* Pl.'s Brief at 25.  But, as the Government points out (and BenQ concedes), Dell™ also sells LCD and plasma televisions, as well as a wide range of other electronics.  *See* Def.'s Brief at 2; Pl.'s Brief at 25.

[5]The Government attacks the methodology of BenQ's survey as "skewed." *See* Def.'s Brief at 19 n.11, 24-25; Def.'s Reply Brief at 5.  Specifically, the Government argues that the results of the survey are wholly unreliable, given asserted flaws including "sample design" and "a high non-response rate which was unaddressed by any follow-up." *See* Def.'s Reply Brief at 5-14.  The Government objects to the report of the "independent expert" engaged by BenQ to conduct the survey, and requests that the report "be stricken from the record or disregarded by [the] Court." *See* Def.'s Brief at 19 n.10.  In light of the rationale herein and the disposition below, there is no need to consider either BenQ's survey or the Government's objections thereto.  Even assuming the validity of its survey, BenQ cannot prevail.

As imported, however, each monitor is equipped with four separate inputs: (1) an analog RGB connector (also called the "D-sub 15" connector); (2) a digital video interface ("DVI-D") connector; (3) a separate video ("S-video") connector; and (4) a composite video connector. *See* Dell™ 2001FP Flat Panel Color Monitor User's Guide (Pl.'s Exh. 16) at 16-15, 16-18, 16-30, 16-51, 16-53 to 16-56; *see also* Pl.'s Brief at 1, 9; Def.'s Brief at 3. The analog RGB and DVI-D inputs are connections for a personal computer. *See* Pl.'s Brief at 9; Def.'s Brief at 3. On the other hand, the S-video and composite video inputs are connections for use with video devices including DVD players and VCRs, as well as game consoles (such as Xbox and PlayStation®3). *See* Pl.'s Brief at 9; Def.'s Brief at 3, 6, 22, 25.[6]

Thus, as designed, manufactured, and imported, the monitors at issue are equipped to receive signals from both computers and other non-computer devices. *See* Pl.'s Brief at 1, 2, 9; Pl.'s Reply Brief at 16-18, 24-25; Def.'s Brief at 3. The monitors even include a "picture-in-picture" feature, allowing a user to split the monitor's screen and simultaneously display, for example, both a movie *and* data from a personal computer. *See* Def.'s Brief at 3; Dell™ 2001FP Flat Panel Color Monitor User's Guide (Pl.'s Exh. 16) at 16-39 to 16-40.

In short, BenQ and the Government agree that the monitors here are "multi-media monitors," which are "designed to function as" and have "the physical characteristics of both an ADP system

---

[6]The monitors also include a 4 port USB 2.0 hub, to allow for the connection of digital cameras, and other devices. *See*, *e.g.*, Dell™ 2001FP Flat Panel Color Monitor User's Guide (Pl.'s Exh. 16) at 16-56 to 16-57 (discussing USB hub); Def.'s Brief at 3. According to the Government, the monitors "can even be attached to a television cable box." *See id*. at 25. In addition, while the monitors are imported with a stand for desk top use, each monitor also includes a flat panel mount, which allows the monitor to be mounted on a wall. *See id*. at 3.

monitor and a video monitor." *See* Pl.'s Brief at 9; Def.'s Brief at 12; *see also* Pl.'s Reply Brief at 1-2, 7-9, 12; Def.'s Brief at 3, 6; Def.'s Reply Brief at 4.

Asserting that the "principal function" of the imported merchandise is "as a computer monitor," BenQ contends that the merchandise should be classified under HTSUS heading 8471 ("Automatic data processing machines and units thereof"), duty-free, as BenQ claimed at the time of importation. *See*, *e.g.*, Pl.'s Brief at 1-2, 18-19, 30; Pl.'s Reply Brief at 1, 26.[7]  In contrast, the Government maintains that Customs correctly classified the monitors under heading 8528 ("Reception apparatus for television . . .; video monitors and video projectors: Video monitors"), dutiable at the rate of five percent *ad valorem*, and that Customs' denial of BenQ's protest should therefore be sustained. *See*, *e.g.*, Def.'s Brief at 1, 4, 6, 8, 29; Def.'s Reply Brief at 1, 15.[8]

## II.  **Standard of Review**

Customs classification decisions are reviewed *de novo*, through a two-step analysis. *See* 28 U.S.C. § 2640; Faus Group, Inc. v. United States, 581 F.3d 1369, 1371-72 (Fed. Cir. 2009).  The first step of the analysis addresses the proper meaning of the relevant tariff provisions, which is a question of law.  The second step involves determining whether the merchandise at issue falls within a particular tariff provision as construed. *See id.* (*citing* Orlando Food Corp. v. United States, 140

---

[7]Specifically, BenQ claims that the monitors at issue should properly be classified under HTSUS subheading 8471.60.45, which covers "Automatic data processing machines and units thereof; . . . . : Input or output units . . . : Other: Display units: Other: Other." *See* Pl.'s Brief at 1, 29-30; Pl.'s Reply Brief at 1, 26; Subheading 8471.60.45, HTSUS.

[8]Specifically, Customs classified the monitors at issue under HTSUS subheading 8528.21.70, which covers "Reception apparatus for television, . . . ; video monitors . . . : Video monitors: Color: With a flat panel screen: Other: Other." *See* Def.'s Brief at 1, 4; Subheading 8528.21.70, HTSUS.

F.3d 1437, 1439 (Fed. Cir. 1998)).

Under USCIT Rule 56, summary judgment is appropriate where "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. *See* USCIT R. 56(c). Summary judgment is thus appropriate in a customs classification case if there is no genuine dispute of material fact (because the nature of the merchandise at issue is not in question), such that the decision on the classification of the merchandise turns solely on the proper meaning and scope of the relevant tariff provisions. *See* Faus Group, 581 F.3d at 1371-72.

In the present case, the parties disagree as to the meaning and scope of the tariff provisions at issue. They are, however, in agreement as to the nature of the imported merchandise. Accordingly, in the absence of any dispute of material fact, this matter is ripe for summary judgment.

## III. Analysis

The tariff classification of all merchandise imported into the United States is governed by the General Rules of Interpretation ("GRIs"), which provide a framework for classification under the HTSUS, and are to be applied in numerical order. *See* BASF Corp. v. United States, 482 F.3d 1324, 1325-26 (Fed. Cir. 2007); 19 U.S.C. § 1202.[9] Under GRI 1, a classification analysis must

---

[9]The HTSUS consists of the General Notes, the General Rules of Interpretation ("GRIs"), the Additional U.S. Rules of Interpretation ("ARIs"), and Sections I to XXII of the HTSUS (including Chapters 1 to 99, together with all Section Notes and Chapter Notes, article provisions, and tariff and other treatment accorded thereto), as well as the Chemical Appendix. *See* BASF Corp., 482 F.3d at 1325-26; Libas, Ltd. v. United States, 193 F.3d 1361, 1364 (Fed. Cir. 1999) (noting that the HTSUS "is indeed a statute but is not published physically in the United States Code") (*citing* 19 U.S.C. § 1202).

begin with the language of the headings, and any relevant Section and Chapter Notes, to determine whether the merchandise at issue is classifiable under a particular tariff provision. *See* Avenues in Leather, Inc. v. United States, 423 F.3d 1326, 1333 (Fed. Cir. 2005).

The first step in a classification analysis is thus to construe the terms of the headings of the HTSUS, together with any pertinent Section and Chapter Notes (which are statutory law), to determine whether they require a specific classification. *See* Avenues in Leather, 423 F.3d at 1333 (explaining that Section Notes and Chapter Notes "are not optional interpretive rules, but are statutory law, codified at 19 U.S.C. § 1202") (internal quotation marks omitted); Degussa Corp. v. United States, 508 F.3d 1044, 1047 (Fed. Cir. 2007) (stating that "[t]he section and chapter notes are integral parts of the HTSUS, and have the same legal force as the text of the headings.").

The Explanatory Notes to the Harmonized Commodity Description and Coding System ("Explanatory Notes") are similarly instructive, and further illuminate the scope and meaning of tariff terms. *See generally* World Customs Organization, Harmonized Commodity Description and Coding System (3d ed. 2002).[10]  The Explanatory Notes are the official interpretation of the Harmonized Commodity Description and Coding System (on which the HTSUS is based), as set forth by the World Customs Organization (the same body which drafts the international nomenclature). *See* Rocknel Fastener, Inc. v. United States, 267 F.3d 1354, 1360 (Fed. Cir. 2001) (noting that Explanatory Notes are "prepared by the World Customs organization to accompany the international harmonized schedule"). As Congress has recognized, the Explanatory Notes "provide

---

[10]All citations to the Explanatory Notes herein are to those in place as of the date of importation of the monitors at issue.

a commentary on the scope of each heading of the Harmonized System and are thus useful in ascertaining the classification of merchandise under the system." H.R. Conf. Rep. No. 576, 100th Cong., 2d Sess. 549 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582; *see also* Guidance for Interpretation of Harmonized System, 54 Fed. Reg. 35,127, 35,128 (Aug. 23, 1989) (noting that the Explanatory Notes provide a commentary on the scope of each heading of the HTSUS, and are the official interpretation of the Harmonized System at the international level).

Accordingly, although the Explanatory Notes "do not constitute controlling legislative history," they serve a critical function as an interpretative supplement to the HTSUS, and "are intended to clarify the scope of HTSUS [provisions], and to offer guidance in interpreting [those provisions]." *See* Mita Copystar Am. v. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994) (citation omitted). The Explanatory Notes are thus highly authoritative – "persuasive" and "'generally indicative of the proper interpretation of a tariff provision.'" Agfa Corp. v. United States, 520 F.3d 1326, 1329-30 (Fed. Cir. 2008) (*quoting* Degussa Corp., 508 F.3d at 1047 (citation omitted)).

Relying largely on Section XVI Note 3 of the HTSUS, BenQ insists that "the fundamental issue in this case" is "the principal function of the imported merchandise, that of a computer monitor or of a video monitor." *See* Pl.'s Reply Brief at 10; *see also* Pl.'s Brief at 1, 17. As set forth below, however, under Chapter 84 Note 5 (read in tandem with the relevant Explanatory Notes), the pivotal issue is instead whether the imported merchandise can "perform[ ] a specific function other than data processing" – or, stated differently, whether the monitors "are capable of accepting a signal *only* from the central processing unit ["CPU"]" of a computer (or whether they can also accept non-computer signals). *See* Note 5(E) to Chapter 84, HTSUS; Explanatory Notes to Heading 8471,

HTSUS, at (I)(D) (emphasis added).

The imported monitors are thus classified under HTSUS heading 8528 under a straightforward GRI 1 analysis.

A.  HTSUS Heading 8528

Customs classified the merchandise at issue under HTSUS heading 8528, a broad *eo nomine* provision covering "Reception apparatus for television, whether or not incorporating radiobroadcast receivers or sound or video recording or reproducing apparatus; *video monitors* and video projectors: *Video monitors*."  *See* Heading 8528, HTSUS (emphases added).[11]  BenQ candidly concedes that the monitors are "capable of connection to a video source as video monitors."  *See* Pl.'s Brief at 2.

As noted above, however, BenQ contends that – notwithstanding their video capability – these monitors are used with computers by the vast majority of purchasers, and are therefore properly classifiable under  HTSUS heading 8471, which covers "*Automatic data processing machines and units thereof*; magnetic or optical readers, machines for transcribing data onto data media in coded form and machines for processing such data, not elsewhere specified or included." *See*, *e.g.*, Pl.'s Brief at 2-3; Heading 8471, HTSUS (emphasis added).

In an effort to support its claimed classification, BenQ highlights the Explanatory Notes to heading 8528, which state that "[v]ideo monitors of this heading [i.e., heading 8528] should not be confused with the display units of automatic data processing machines described in the Explanatory

---

[11]An *eo nomine* tariff provision is one that describes the covered merchandise by name, rather than by use.  *See* BASF Corp., 482 F.3d at 1326 & n.2.  An *eo nomine* provision ordinarily includes all forms of the named article. *See* Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (citation omitted).

Note to heading 84.71." *See* Pl.'s Brief at 16; Explanatory Notes to Heading 8528, HTSUS, at (6);

*see also* Pl.'s Reply Brief at 21. The Explanatory Notes further underscore that heading 8528

"excludes, *inter alia*, (a) Display units of automatic data processing machines, whether or not

presented separately (heading 84.71)." *See* Pl.'s Brief at 16-17; Explanatory Notes to Heading 8528,

HTSUS.

Contrary to BenQ's claims, analysis of the Notes to Chapter 84, read *in pari materia* with

the relevant Explanatory Notes, makes it clear that the monitors at issue cannot be classified as

"units" of automatic data processing machines under heading 8471. *See* section III.B, *infra*.

Accordingly, the Explanatory Notes to heading 8528 do not exclude these monitors; and, indeed,

as "video monitors," they are properly classified thereunder.

### B. <u>HTSUS Heading 8471</u>

Invoking Note 3 to Section XVI of the HTSUS,[12] BenQ contends that the monitors here are

"machines designed for the purpose of performing two or more complimentary or alternative

functions," and therefore must be classified under HTSUS heading 8471, in accordance with their

"principal function" – which, according to BenQ, is "serving as a monitor for a computer or an

automatic data processing machine (ADP)." *See* Pl.'s Brief at 1-3, 14-22 (discussing Section XVI,

Note 3); *id*. at 1-2, 18-19 (discussing "principal function" of monitors at issue); Pl.'s Reply Brief

at 2-4, 7-13, 15-16, 22-23, 25-26 (discussing Section XVI, Note 3); *id*. at 3, 15 (discussing

"principal function" of monitors at issue). As explained below, however, BenQ's reliance on

---

[12]Both Chapter 84 and Chapter 85 (and, thus, both heading 8471 heading 8528) are within Section XVI of the HTSUS.

Section Note 3 is misplaced.

Section XVI Note 3 is prefaced with an express proviso – "[u]nless the context otherwise

requires . . . .":

> *Unless the context otherwise requires*, composite machines consisting of two or more
> machines fitted together to form a whole and other machines designed for the
> purpose of performing two or more complementary or alternative functions are to be
> classified as if consisting only of that component or as being that machine which
> performs the principal function.

Note 3 to Section XVI, HTSUS (emphasis added). The terms of HTSUS heading 8471 and the

detailed, mandatory statutory criteria set forth in the relevant Chapter Notes governing classification

as a "unit" of an ADP machine (discussed immediately below) plainly constitute a "context [which]

otherwise requires," overriding the general, default rule in Note 3 to Section XVI. *See* Def.'s Brief

at 7, 12-13, 23-24 (explaining that "[t]he terms of Heading 8471 and the mandatory statutory

requirements for classification as a 'unit' of an automatic data processing machine constitute the

context which nullifies the applicability of Section XVI Note 3 here"); Def.'s Reply Brief at 2 n.1

(stating that "Note 3 . . . simply does not apply").[13]

In short, to the extent that the provisions conflict, the rule of general application set forth in

Section XVI Note 3 has no relevance here, because it yields to the terms of heading 8471, and, more

---

[13]BenQ asserts that its interpretation of Section XVI Note 3 is necessary to avoid rendering
that provision "inoperative or superfluous." *See* Pl.'s Reply Brief at 12-13. To the contrary, the
holding here is limited specifically to the implications of Section XVI Note 3 (or lack thereof) for
the classification of "automatic data processing machines" and "units" of such machines pursuant
to HTSUS heading 8471 and Note 5 to Chapter 84. The holding here thus says nothing about the
implications of Section XVI Note 3 for the classification of "composite machines . . . and other
machines designed for the purpose of performing two or more complementary or alternative
functions" in general.

specifically, to Note 5 to Chapter 84 (which deals exclusively with merchandise classified under

heading 8471 as "automatic data processing machines" and "units" thereof). *Cf*. <u>Mitsubishi Int'l</u>

<u>Corp. v. United States</u>, 182 F.3d 884, 886 (Fed. Cir. 1999) (construing tariff provision preceded by

proviso similar to that here, which stated that tariff provision applied "[i]n the absence of special

language or context which otherwise requires").[14]

_____

[14]Customs issued no ruling letter in this case. *See* Pl.'s Brief at 3, 4. Nor are there any other Customs rulings specifically addressing the Dell™ 2001FP Flat Panel Color Monitor. *Id*. Nevertheless, although (as explained above) the Government here argues that Section XVI Note 3 has no application to this case, and although the Government further states that Customs did not base its classification in this case on that Note (*see* Def.'s Reply Brief at 15), the Government requests that – in the event that Section XVI Note 3 *is* determined to be relevant – Customs' position on the classification of the monitors at issue be accorded <u>Skidmore</u> deference. *See* Def.'s Brief at 7, 26-28; Def.'s Reply Brief at 2 n.1; <u>United States v. Mead Corp.</u>, 533 U.S. 218, 219-20 (2001); <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944). According to the Government, Customs' position on the classification of "multimedia monitors" and the construction of the relevant statutory provisions is set forth in HQ 966270 (June 3, 2003), HQ 963314 (July 30, 2001), HQ 962677 (Sept. 23, 1999), HQ 967013 (Oct. 27, 2004), and HQ 960282 (Oct. 22, 1998). *See* Def.'s Brief at 26.

BenQ vigorously disputes the Government's claim to <u>Skidmore</u> deference. *See generally* Pl.'s Brief at 3, 4-9; Pl.'s Reply Brief at 21-22. BenQ argues, *inter alia*, that the monitors classified in the rulings cited by the Government were of different sizes; that Customs' use of a "class or kind" analysis in the rulings is inconsistent with the agency's reliance on Section XVI Note 3; that Customs' rulings have been inconsistent in ascertaining "principal function" by applying the <u>Carborundum</u> factors (which are traditionally used to determine "principal *use*" under Additional U.S. Rule of Interpretation ("ARI") 1(a)); and that, ultimately, Customs' rulings have failed to determine the "principal function" of the monitors there at issue, and have resorted to GRI 3(c) to classify the monitors under the heading last in numerical order among the headings that equally merit consideration. *See*, *e.g.*, Pl.'s Brief at 3, 4-9; Pl.'s Reply Brief at 21-22; <u>United States v. Carborundum Co.</u>, 536 F.2d 373, 376 (1976).

The conclusion that Section XVI Note 3 has no relevance to the classification of the merchandise at issue (outlined above) obviates any need to reach either the Government's claim to <u>Skidmore</u> deference or BenQ's arguments in opposition.

In support of its claim that the monitors' "principal function" compels their classification under heading 8471, BenQ also relies on Note 5 to Chapter 84. *See*, *e.g.*, Pl.'s Brief at 15-16; *see also* Pl.'s Reply Brief at 10.[15] But – like its reading of Note 3 to Section XVI – BenQ's reading of Note 5 to Chapter 84 is fundamentally flawed.

Read *in pari materia*, the terms of the heading and the Chapter Notes to Chapter 84 effectively exclude monitors such as those at issue here from the scope of heading 8471. In its entirety, Note 5 to Chapter 84 reads:

> (A)     For purposes of heading 8471, the expression "*automated data processing machines*" means:
>
> > (a)     Digital machines, capable of (1) storing the processing program or programs and at least the data immediately necessary for execution of the program; (2) being freely programmed in accordance with the requirements of the user; (3) performing arithmetical computations specified by the user; and, (4) executing, without human intervention, a processing program which requires them to modify their

---

[15]Note 5 to Chapter 84 actually refers to "principal[ ] use[ ]," rather than "principal function" (the term used in Section XVI Note 3). *See* Note 5(B)(a) to Chapter 84, HTSUS; Note 3 to Section XVI, HTSUS. The Government maintains that, as such, Chapter 84 Note 5(B)(a) is governed by ARI 1(a), and requires that BenQ demonstrate both (1) the class or kind of merchandise to which the monitors at issue belong, and (2) the principal use of that class or kind of merchandise at or immediate prior to the date these monitors were imported. *See* Def.'s Brief at 15-17; Def.'s Reply Brief at 3-4.

BenQ disputes the Government's assertion that BenQ is required to establish the "principal use" of the monitors pursuant to ARI 1(a). *See* Pl.'s Brief at 12-14; Pl.'s Reply Brief at 2-4, 10-13. But, arguing in the alternative, BenQ essentially seeks to recast its "principal function" evidence as evidence of "principal use," using the <u>Carborundum</u> factors. *See* Pl.'s Brief at 19-29; Pl.'s Reply Brief at 4-6, 23-26. The Government, in turn, challenges the adequacy of BenQ's showing. *See* Def.'s Brief at 18-20, 24; Def.'s Reply Brief at 4. In light of the rationale and disposition here, there is no need to reach any of these issues.

execution, by logical decision during the processing run;

(b)     Analog machines capable of simulating mathematical models and comprising at least: analog elements, control elements and programming elements;

(c)     Hybrid machines consisting of either a digital machine with analog elements or an analog machine with digital elements.

(B)     Automatic data processing machines may be in the form of systems consisting of a variable number of separate units. *Subject to paragraph (E) below*, a unit is to be regarded as being a part of a complete system if it meets all of the following conditions:

(a)     *It is of a kind solely or principally used in an automatic data processing system*;

(b)     It is connectable to the central processing unit either directly or through one or more other units; and

(c)     It is able to accept or deliver data in a form (codes or signals) which can be used by the system.

(C)     Separately presented units of an automatic data processing machine are to be classified in heading 8471.

(D)     Printers, keyboards, X-Y coordinate input devices [*e.g.*, computer mice] and disk storage units [*i.e.*, disk drives] which satisfy the conditions of paragraphs (B)(b) and (B)(c) above, are in all cases to be classified as units of heading 8471.

(E)     *Machines performing a specific function other than data processing* and incorporating or working in conjunction with an automatic data processing machine *are to be classified in the headings appropriate to their respective functions* or, failing that, in residual headings.

Note 5 to Chapter 84, HTSUS (first emphasis in the original).[16]

---

[16]BenQ devotes one section of its opening brief to simply quoting the text of various tariff provisions. Among the provisions quoted there is Chapter 84 Note 7, which provides that "[a]

In brief, as quoted above, Note 5 to Chapter 84 is specifically addressed exclusively to HTSUS heading 8471. Note 5(A) defines the term "automatic data processing machines," as that term is used in heading 8471. *See* Note 5(A) to Chapter 84. Note 5(B) – the heart of BenQ's case – explains that an ADP machine may be a "system" consisting of multiple different individual "units"; and, more importantly for BenQ's purposes, Note 5(B) defines the scope of the term "unit" of an ADP system, including, *inter alia*, a requirement that the merchandise be "of a kind . . . *principally used* in an automatic data processing system." *See* Note 5(B) to Chapter 84 (emphasis added). The effect of Note 5(C) is to make units of an ADP machine classifiable under 8471 even if they are "[s]eparately presented" (*i.e.*, even if the units are not imported as part of a system as a whole). *See* Note 5(C) to Chapter 84. Note 5(D) underscores that certain common computer peripherals (*e.g.*, printers, keyboards, computer mice, and disk drives) are "in all cases" to be classified under heading 8471, provided that they are "connectable to the central processing unit" and that they are "able to accept or deliver data in a form (codes or signals) which can be used by the system." *See* Note 5(D) to Chapter 84. In effect, the common computer peripherals listed in Note 5(D) are classifiable under heading 8471 even if they do not satisfy the requirements of Note

machine which is used for more than one purpose is, for the purposes of classification, to be treated as if its principal purpose were its sole purpose." *See* Pl.'s Brief at 10 (captioned "The Relevant Tariff Provisions") (*quoting* Note 7 to Chapter 84, HTSUS). But BenQ makes no other reference to the provision in its briefs. In any event, that general provision has no relevance here, in light of the specific principles set forth in Chapter 84 Note 5, which deal exclusively with merchandise classified under heading 8471 as "automatic data processing machines" and "units" thereof. Certainly nothing in Chapter 84 Note 7 requires classification of the merchandise at issue under heading 8471.

5(B)(a) (*i.e.*, even if they are not "solely or principally used" in an ADP system).[17]  Significantly, monitors are not among the common computer peripherals listed in Note 5(D) which are (essentially) "in all cases" to be classified under heading 8471.  Note 5(D) thus evinces the clear intent of the drafters (and Congress) that not all monitors capable of functioning as computer monitors would be classifiable under heading 8471.  And, finally, Note 5(E) provides, *inter alia*, that if an ADP machine (including a unit thereof)[18] performs a specific function other than data processing, it is "to be classified in the heading[] appropriate to [its] respective function[] or, failing that, in [a] residual heading[]."  *See* Note 5(E) to Chapter 84, HTSUS.

Thus, under Note 5(E), for example, where (as here) a "unit" is designed in such a way as to permit it to perform a specific function other than, or in addition to, data processing – or where, for example, the addition of a certain "unit" to an ADP system would enable that system to perform functions other than data processing – then it is to be classified "in the heading[] appropriate to [its] respective function[] or, failing that, in [a] residual heading[]."  *See* Note 5(E) to Chapter 84, HTSUS.[19]

---

[17]In addition, unlike Chapter 84 Note 5(B), Note 5(D) also does not expressly cross-reference Note 5(E).  *Compare* Note 5(B) to Chapter 84, HTSUS *and* Note 5(E) to Chapter 84, HTSUS.

[18]*See* Explanatory Notes to Heading 8471, HTSUS, at (I)(D) ("Separately Presented Units"), discussed *infra*.

[19]Although the monitors here are capable of "working in conjunction with an automatic data processing machine," they are also indisputably capable of performing a non-ADP function (a function that is completely separate from, and completely independent of, a computer system).  *See* Note 5(E) to Chapter 84, HTSUS.

BenQ argues, at some length, that the monitors here are – in the words of Note 5(B)(a) – "principally used in an automatic data processing system." *See*, *e.g.*, Pl.'s Brief at 1-2, 18-19; Pl.'s Reply Brief at 3, 15; Note 5(B)(a) to Chapter 84, HTSUS.  However, while it is *necessary* to classification under heading 8471 that the monitors be "of a kind solely or principally used in an automatic data processing system," that showing is not *sufficient*.

As quoted above, Note 5(B) includes an express limitation:  "*Subject to paragraph* (*E*) [*i.e.*, Note 5(E)] *below . . .* "  *See* Note 5(E) to Chapter 84 (emphasis added).  In other words, even if the merchandise here satisfies the criteria set forth in Note 5(B)(a), (b), and (c) (as BenQ contends that these monitors do), the merchandise nevertheless is not classifiable under heading 8471 as units of ADP machines if the merchandise is excluded from that heading by Note 5(E).

As discussed above, BenQ failed to appreciate the significance of the proviso in Section XVI Note 3 – "Unless the context otherwise requires . . . ."  *See* Note 3 to Section XVI, HTSUS.  So, too, BenQ similarly fails to appreciate the significance of the proviso in Note 5(B) to Chapter 84 – "Subject to paragraph (E) below . . . ."  *See* Note 5(B) to Chapter 84, HTSUS.  BenQ ignores the limiting effect of Note 5(E), which is not only (like Note 5(B)) a distinct and integral subpart of Note 5, but is – in addition – expressly cross-referenced and incorporated into Note 5(B), on which BenQ heavily relies.[20]

---

[20]BenQ fails to acknowledge either the independent existence of Chapter 84 Note 5(E) or its incorporation by reference into Chapter 84 Note 5(B).  *See*, *e.g.*, Pl.'s Brief at 15-16 (arguing that merchandise at issue satisfies subparagraphs (a), (b), and (c) of Note 5(B) to Chapter 84, but ignoring Note 5(B)'s introductory proviso, "[s]ubject to paragraph (E) below . . . "); Pl.'s Reply Brief at 13 (same).  It necessarily follows that BenQ never addresses Chapter 84 Note 5(E), much less explains the significance of Note 5(E) in the context of the related Explanatory Notes to heading

It is undisputed that the monitors at issue are "capable of connection to a video source as video monitors," and thus can "perform[ ] a specific function other than data processing." *See* Pl.'s Brief at 2; Note 5(E) to Chapter 84, HTSUS. And, because the monitors "perform[  ] a specific function other than data processing," Note 5(E) to Chapter 84 effectively excludes them from classification under heading 8471, and mandates their classification under "the heading[] appropriate to their respective function[] . . . ." – even assuming that the monitors are "of a kind . . . principally used in an automatic data processing system," as BenQ claims. *See* Notes 5(B)(a) & 5(E) to Chapter 84, HTSUS.

This result is confirmed by the relevant Explanatory Notes, which eliminate any conceivable doubt, both as to the interrelationship and significance of the various paragraphs of Note 5 to Chapter 84 and as to the outcome in this case. Paraphrasing and elucidating Note 5(E) to Chapter 84, the Explanatory Notes to HTSUS heading 8471 state flatly and unequivocally:

> *If* [*a*] *unit performs a specific function other than data processing*, *it is to be classified in the heading appropriate to that function* or, failing that, in a residual heading (see Note 5(E) to this Chapter [*i.e.*, Chapter 84]).

Explanatory Notes to Heading 8471, HTSUS, at (I)(D) ("Separately Presented Units") (emphasis added). The Explanatory Notes similarly emphasize the point that, to be classified under heading 8471, it is not enough that a unit satisfy the criteria set forth in Note 5(B)(a), (b), and (c); in addition, the unit also must not be "excluded by the provisions of Note 5(E) to this Chapter [*i.e.*, Chapter 84])." *See* Explanatory Notes to Heading 8471, HTSUS, at (I)(D).

---

8471, discussed below.

Finally, and most explicitly, the Explanatory Notes to heading 8471 expressly address "display units of [ADP] machines," and painstakingly differentiate such display units (which are classified under heading 8471) from "video monitors and television receivers of heading 85.28," crystallizing the bright line distinction between "display units" that accept signals *only* from a computer *versus* those that accept signals from other devices as well:

> Among the constituent units included [under heading 8471] are display units of automatic data processing machines which provide a graphical presentation of the data processed. They differ from the video monitors and television receivers of *heading 85.28* in several ways, including the following:
>
> (1)     *Display units of automatic data processing machines* are capable of accepting a signal *only* from the central processing unit of an automatic data processing machine . . . .

Explanatory Notes to Heading 8471, HTSUS, at (I)(D) (first emphasis in the original). Here – as in Agfa – to the extent that "the language of [the] heading [as well as the language of the Chapter Notes] might allow for some ambiguity, the Explanatory Notes to [the heading] do not":

> [The Explanatory Notes] directly address the issue under consideration here. . . . It is hard to imagine a more definitive statement on the matter before [the court]. The exact goods at issue are specifically described and excluded from [the heading under consideration], and the reader is specifically directed to [a different heading], the heading under which Customs has classified the merchandise.

Agfa Corp., 520 F.3d at 1330.

As noted above, BenQ candidly concedes that "the imported merchandise is equipped with connectors that enable it to accept signals from either an ADP machine or a video source." *See* Pl.'s Reply Brief at 17. The monitors thus do not satisfy the specifications for "display units" of ADP machines set forth in paragraph (1) quoted immediately above. Under these circumstances, it is

therefore of no moment whether – as BenQ claims – the monitors here "conform[] to the specifications of 'units' of ADP machines described in paragraphs (2)-(5) of the Explanatory Notes for heading 8471." *See* Pl.'s Reply Brief at 19; *see generally id.* at 16-21 (analyzing extent to which monitors at issue meet the specific individual criteria (1)-(5) outlined in Explanatory Notes to Heading 8471, HTSUS, at (I)(D)).[21]

In the words of paragraph (1) of the Explanatory Notes to heading 8471 (at (I)(D)), which must be read *in pari materia* with Chapter 84 Notes 5(B) and (E), the monitors here are not "capable of accepting a signal *only* from the central processing unit of an automatic data processing machine."

---

[21]Turning a blind eye to the critical word "only" in criterion (1) (*i.e.*, the requirement that display units classifiable under heading 8471 be "capable of accepting a signal *only* from the central processing unit of an automatic data processing machine"), BenQ states unequivocally at one point in its briefing that "the imported merchandise conforms to the characteristics of display units of ADP machines as described in paragraphs (1)-(5) of the Explanatory Notes for heading 8471." *See* Pl.'s Reply Brief at 20-21; Explanatory Notes to Heading 8471, HTSUS, at (I)(D) (emphasis added).

As explained above, however, that statement is patently false, as even BenQ itself elsewhere concedes. *See*, *e.g.*, Pl.'s Reply Brief at 19 (arguing that the monitors here "conform[] to the specifications of 'units' of ADP machines *described in paragraphs* (*2*)-(*5*) of the Explanatory Notes for heading 8471") (emphasis added); *id.* at 24 (referring to "the physical characteristics of displays of heading 8471, described in the Explanatory Notes of heading 8471, *most of which* are shared by the imported merchandise") (emphasis added).

As the bar was recently reminded, such statements are inconsistent with the obligations of counsel under USCIT Rule 11(b), which provides that an attorney's signature on court papers certifies, among other things, that each of "the claims, defenses, and other legal contentions" therein "are warranted by existing law" (or a non-frivolous argument for the extension or modification of the law), and that all "factual contentions have evidentiary support." USCIT Rule 11(b). "Inherent in that certification is the assertion that the existing law, as well as the facts of record, have been stated 'accurately and correctly.'" *See* Diamond Sawblades Mfgrs.' Coalition v. United States, 34 CIT ____, ____, 2010 WL 517477 * 5 (2010) (*quoting* Precision Specialty Metals, Inc. v. United States, 315 F.3d 1346, 1356 (Fed. Cir. 2003)).

*See* Explanatory Notes to Heading 8471, HTSUS, at (I)(D) (emphasis added); Notes 5(B) & (E) to

Chapter 84, HTSUS.  Because they can "perform[ ] a specific function other than data processing,"

the monitors at issue cannot be classified as display "units" of "automatic data processing machines"

under heading 8471 of the HTSUS.  *See* Note 5(E) to Chapter 84, HTSUS.[22]

## C.  Classification of the Subject Merchandise

As discussed above, the imported monitors cannot be classified as display "units" of

"automatic data processing machines" under HTSUS heading 8471.  *See* section III.B, *supra*.  By the

same token, it is undisputed that the monitors are video monitors.  *See* section III.A, *supra*.  As such,

they are classifiable as "video monitors" under the broad *eo nomine* heading 8528, and thus were

properly classified thereunder.  *See* section III.A, *supra*.  All that remains now is to ascertain the

proper subheading.

Customs classified the monitors under subheading 8528.21.70, which covers "Reception

apparatus for television, . . . ; video monitors . . . : Video monitors: Color: With a flat panel screen:

Other: Other."  *See* Subheading 8528.21.70, HTSUS.  Here, there is no claim by BenQ that some

other subheading of heading 8528 more specifically describes the imported merchandise.  An

---

[22]As of 2007, HTSUS heading 8528 was amended to cover all monitors "[o]f a kind solely or principally used in an automatic data processing system of heading 8471."  *See* Subheading 8528.41.00, HTSUS (2007) (covering " . . . Cathode-ray tube monitors: Of a kind solely or principally used in an automatic data processing system of heading 8471"); Subheading 8528.51.00, HTSUS (2007) (covering ". . . Other monitors:  Of a kind solely or principally used in an automatic data processing system of heading 8471").

independent review of the potential subheadings confirms that, in fact, there is none. The monitors were thus properly classified under subheading 8528.21.70 of the HTSUS.

## IV. Conclusion

For all the reasons set forth above, the Dell™ 2001FP Flat Panel Color Monitors at issue were properly classified as "video monitors" under subheading 8528.21.70 of the HTSUS. Plaintiff's motion for summary judgment must therefore be denied, and Defendant's cross-motion must be granted.

Judgment will enter accordingly.

/s/ Delissa A. Ridgway

Delissa A. Ridgway
Judge

Decided: March 1, 2010
New York, New York

# ERRATA

BenQ America Corporation v. The United States, Court No. 05-00637, Slip Op. 10-20, dated March 1, 2010.


Page 7:         In the penultimate line of the main body of text, replace "World Customs organization" with "World Customs Organization"

Page 10:        In footnote 12, replace "heading 8471 heading 8528" with "heading 8471 and heading 8528"

Page 12:        In the last line of the second paragraph of footnote 14, replace "(1976)" with "(C.C.P.A. 1976)"

Page 13:        In the penultimate line of the first paragraph of footnote 15, replace "immediate" with "immediately"


March 10, 2010